# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
## C.A. No. 1:23-cv-344

| | |
|---|---|
| BORGWARNER TURBO SYSTEMS, LLC, a Delaware limited liability company,<br><br>         Plaintiff,<br><br>vs.<br><br>MODERN INDUSTRIES, INC., a Pennsylvania corporation,<br><br>         Defendant. | **VERIFIED COMPLAINT** |

Plaintiff BorgWarner Turbo Systems, LLC, ("BorgWarner"), for its Verified Complaint against Defendant Modern Industries, Inc. ("Modern"), states as follows:

## Parties, Jurisdiction, and Venue

1. BorgWarner is a Delaware limited liability company with its principal place of business located in Auburn Hills, Michigan. The sole member of BorgWarner is a Delaware corporation.

2. Upon information and belief, Modern is a Pennsylvania corporation with its principal place of business located in Erie, Pennsylvania.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between BorgWarner and Modern, and because the amount in controversy exceeds $75,000, exclusive of costs, interest, and attorney fees.

4. This Court has personal jurisdiction over Modern because Modern regularly conducts business in North Carolina by, among other things, contracting with BorgWarner in North Carolina, supplying commercial vehicle parts to BorgWarner in North Carolina that are used

1

in production in North Carolina, and regularly interacting with BorgWarner in North Carolina as necessary for Modern to meet its obligations under the contract at issue.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

### The Parties' Supply Contract

6. BorgWarner, as buyer, and Modern, as seller, are parties to a long-term requirements contract evidenced by twelve Purchase Orders and BorgWarner's Purchase Order Terms and Conditions incorporated into those Purchase Orders (collectively, the "Supply Contract") for the supply of turbine housing (the "Parts"), which BorgWarner incorporates into turbocharger assemblies that it supplies to its commercial vehicle customers to incorporate into engines for placement into commercial vehicles. These Purchase Orders and BorgWarner's Purchase Order Terms and Conditions are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively.

7. The Supply Contract is a requirements contract that requires Modern to supply, and BorgWarner to purchase, all of BorgWarner's quantity requirements for the Parts. (*See* Ex. 2, § 1.)

8. The Supply Contract expressly states that the Purchase Orders and incorporated BorgWarner Purchase Order Terms and Conditions constitute the entire agreement between the parties, and that any terms inconsistent with these contract documents, including any quotations or invoices from Modern, are expressly rejected. (*See* Ex. 2, §§ 1, 27.)

9. Pursuant to the terms of the Supply Contract, once issued to Modern, Modern can accept the Purchase Orders in various ways, including by beginning performance under such Supply Contract or by delivering Parts to BorgWarner under such Purchase Orders. (*See* Ex. 2, § 1.

10. Here, Modern accepted the Supply Contract through performance by shipping Parts according to releases issued under each of the Purchase Orders.

2

11. Modern never rejected or otherwise objected to any of the Purchase Orders prior to accepting each Purchase Order by performing under it.

12. Modern is BorgWarner's single-source supplier for all of the Parts, which are custom designed and engineered to meet particular programs of BorgWarner's customers.

13. BorgWarner orders Parts under the Supply Contract by issuing electronic delivery schedules (referred to as "releases") to Modern through an online system shared by the parties. (*See* Ex. 2, § 4.) The releases identify BorgWarner's firm requirements of the Parts and forecasted future requirements and tell Modern the specific quantities and dates for each shipment of supply due under the Supply Contract.

14. The Supply Contract has a term that lasts for the duration of the various OEMs' program production life, and Modern is expressly bound to continue supplying BorgWarner's requirements as ordered, and expressly prohibited from terminating the Supply Contract, for the duration of that term. (*See* Ex. 2, §§ 1, 10)

15. The Supply Contract requires timely delivery of all Parts ordered by BorgWarner as indicated on BorgWarner's delivery schedules:

> Deliveries must be made both in quantities and at times specified on the face of this Purchase Order or in Buyer's schedules and time is of the essence. Buyer's delivery schedules are an integral part of the Purchase Order, are governed by these terms and conditions and are not independent contracts. [Ex. 2, § 4.]

16. This requires Modern to deliver all the Parts ordered by BorgWarner on time and in the quantities ordered. (Ex. 2, § 4.)

17. The Supply Contract provides for firm prices. (*Id.*, §2.)

18. The Supply Contract also expressly contemplates changes in Modern's costs, for any reason, associated with Modern's performance under the Supply Contract, and the parties agreed to contractually allocate that risk to Modern:

3

This Purchase Order must not be filled at prices higher than those specified on the Purchase Order, unless otherwise agreed to in writing by [BorgWarner]. . . [BorgWarner] will have no responsibility for any increased costs incurred by [Modern] in connection with any raw materials or subcontractors, unless such additional costs have been negotiated and agreed to in advance and in writing by [BorgWarner]. [Ex. 2, § 2.]

19. The Supply Contract also includes an indemnification provision requiring Modern to indemnify BorgWarner for all losses set forth therein. (Ex. 2, § 19.)

20. The parties also agreed that the Supply Contract "is to be construed according to the law of the State of Michigan, without regard to its conflicts of law principles." (Ex. 2, § 27.)

## Modern Breaches the Supply Contract

21. For many years, Modern generally performed in accordance with the Supply Contract by timely supplying BorgWarner's requirements for the Parts.

22. However, in late 2022, contrary to the terms of the Supply Contract, Modern began demanding price increases from BorgWarner. Modern also demanded that BorgWarner implement minimum order quantities in connection with the Supply Contract.

23. BorgWarner did not agree to Modern's demand for price increases or the implementation of minimum order quantities.

24. However, while BorgWarner was under no contractual obligation to provide any extra-contractual price increases to Modern, BorgWarner attempted to work with Modern in good faith to reach a compromise on some price adjustments in an effort to ensure that the supply chains remain running.

25. Modern did not negotiate in good faith with BorgWarner and instead reiterated its non-contractual demands for price increases and minimum order quantities.

26. BorgWarner refused to accede to Modern's demands.

27. BorgWarner continued to issue releases to Modern for BorgWarner's requirements of the Parts.

28. However, in direct contravention of its contractual obligations, Modern stopped all shipments of the Parts.

29. Modern supplies twelve (12) types of Parts to BorgWarner pursuant to the Supply Contract.

30. As of this date, Modern has missed shipments for eleven (11) types of Parts.

31. On October 20, 2023, BorgWarner contacted Modern regarding its critical need for seven types of Parts from Modern to ensure the supply chains remain running (the "Critical Needs Parts"). (*See* **Exhibit 3**, *10/20/23 Email to Modern*.) BorgWarner specified the quantity of Critical Needs Parts needed from Modern immediately to ensure the continued operation of the supply chain. (*See id.*)

32. Modern responded but did not agree to deliver the Critical Needs Parts. (*See* **Exhibit 4**, *10/20/23 Email from Modern*.) While Modern stated it would be "available to discuss further," it ceased all further communication with BorgWarner. (*See id.*)

33. Because Modern failed to deliver the Parts to BorgWarner as required under the Supply Contract, BorgWarner's Arden, North Carolina plant ran out of its Parts inventory to supply its customers.

34. BorgWarner is currently out of seven (7) types of Parts, which constitute the Critical Needs Parts.

35. Consequently, on October 31, 2023, BorgWarner's counsel sent a letter to Modern requesting written adequate assurances under UCC § 2-609 that Modern would abide by its contractual obligations and resume timely supplying the Parts at the fixed contract prices as

5

required pursuant to the releases issued under the Supply Contract. (*See* **Exhibit 5**, *10/31/23 Letter to Modern*.)

36. BorgWarner also reminded Modern that, under the Supply Contract, Modern must supply BorgWarner with all of its requirements for the Parts at fixed prices during the life of the relevant OEM customer programs; Modern is prohibited from unilaterally increasing any Part's price for any reason; and Modern assumed the risk that its costs may increase over the life of the Supply Contract when the parties entered into their agreement. (*See id.*)

37. BorgWarner also reminded Modern of its obligation to ship Parts on an expedited basis (at Modern's expense) in the event Modern fails to meet delivery requirements. (*See id.*) BorgWarner thus communicated its expectation that Modern deliver the Critical Needs Parts immediately and on an expedited basis to ensure the supply chains remain running. (*See id.*)

38. BorgWarner also notified Modern that BorgWarner had run out of Parts and at least one customer would be experiencing line shutdowns beginning on November 1, 2023. (*See id.*)

39. On November 1, 2023, Modern acknowledged receipt of the correspondence but provided no substantive response. (*See* **Exhibit 6**, *11/1/23 Email from Modern*.)

40. BorgWarner's counsel responded and advised Modern that Modern's email did not respond to BorgWarner's demand for adequate assurance of due performance or provide a timeline for such a response. (*See* **Exhibit 7**, *11/2/23 Email to Modern*.) BorgWarner's counsel also reiterated the critical importance of receiving expedited delivery of the Critical Needs Parts so that the supply chain could restart operation. (*See id.*)

41. Modern did not respond.

42. Despite receiving no response, BorgWarner continued to attempt to resolve the parties' dispute and prevent continued disruption of the supply chain.

43. On November 7, 2023, BorgWarner issued "spot buy" purchase orders to Modern at the new pricing demanded by Modern for the Critical Needs Parts. (*See* **Exhibit 8**, *11/7/23 Email to Modern*.)

44. BorgWarner issued these "spot buy" purchase orders under protest and with a full reservation of BorgWarner's rights as a temporary measure to ensure the supply chain can continue running while the parties discuss a commercial resolution. (*See id.*)

45. BorgWarner gave Modern a deadline of November 8, 2023 at 12:00 p.m. to respond. (*See id.*)

46. Modern did not respond.

47. That evening, BorgWarner advised Modern that, because Modern had ignored all attempts by BorgWarner to reach a commercial resolution, BorgWarner had no choice but to pursue legal action. (*See* **Exhibit 9**, *11/8/23 Email to Modern*.)

48. Modern responded the next afternoon, but once again failed to provide any substantive response. (*See* **Exhibit 10**, *11/9/23 Email from Modern*.)

49. Significantly, Modern failed to commit to expedited shipment of the Critical Needs Parts or otherwise commit to continue shipments of the Parts in compliance with its contractual obligations. (*See id.*)

50. The next day, BorgWarner responded to again reiterate the emergency situation Modern had created and the critical importance of receiving the Critical Needs Parts. (*See* **Exhibit 11**, *11/10/23 Email to Modern*.)

51. On Monday, November 13, 2023, BorgWarner's counsel finally received correspondence from legal counsel for Modern. (*See* **Exhibit 12**, *11/13/23 Letter from Modern*.)

52. However, rather than attempt to work cooperatively with BorgWarner, Modern expressly and unequivocally repudiated its contractual obligations. (*See id.*)

53. Modern rejected BorgWarner's "spot buy" purchase orders, which offered to purchase the Critical Needs Parts at the exact price increase demanded by Modern. (*See id.*)

54. Modern also stated that it "is suspending its performance" under the Supply Contract, refusing to manufacture and deliver the Parts. (*Id.*) Modern also disclosed that it had stopped purchasing components for the Parts, therefore could not manufacture certain Parts, and anticipated it would take weeks to purchase and receive these components to even restart manufacture of the Parts. (*Id.*)

55. Modern did not make a counteroffer to the "spot buy" purchase orders, offering no avenue by which BorgWarner could temporarily resolve the parties' dispute to receive Parts and resume operation of the supply chain. (*See id.*)

56. Nonetheless, in a final attempt to restart the supply chain, BorgWarner sent new "spot buy" purchase orders on November 20, 2023 at the exact price increase demanded by Modern, in the exact quantities demanded by Modern, on accelerated payment terms, and withdrawing its reservation of rights with regard to the quantities purchased (the "Spot Buy Offer"). (*See* **Exhibit 13**, *11/20/23 Email to Modern*; **Exhibit 14**, *11/20/23 Letter to Modern*.)

57. BorgWarner gave Modern a deadline of November 21, 2023 at 3:00 p.m. to accept or reject the Spot Buy Offer.

58. Modern rejected the Spot Buy Offer, and instead attempted to extract a litany of concessions from BorgWarner as to entirely separate programs.

59. As a result of Modern's breach of the Supply Contract, BorgWarner has already run out of the Parts needed to produce turbochargers for certain of its customers and has missed

deliveries to its customers missed deliveries to BorgWarner's customers will continue in the coming days and weeks.

60. Such missed deliveries has and will prevent BorgWarner's customers from manufacturing the commercial vehicles at issue, shutting down the supply chain.

61. One of BorgWarner's customers, John Deere, has already suffered a line shutdown as a result, and BorgWarner anticipates additional customers' lines will shut down in the coming weeks.

62. These line shutdowns will force BorgWarner and its customers to send workers home, reduce hours, and potentially undertake lay-offs, among other impacts on the industry and wider economy.

### Modern's Refusal to Ship Parts Requires Injunctive Relief

63. Modern supplies the Parts to BorgWarner on a just-in-time basis. Once BorgWarner receives the Parts from Modern, it incorporates them into turbocharger assemblies that it then supplies on a just-in-time basis to its OEM customers, John Deere and Caterpillar.

64. Just-in-time delivery means that BorgWarner only orders the quantities of Parts it needs when it needs them. This is done because vehicle manufacturers' needs for parts fluctuate widely with customer demands. As a result, manufacturers often do not know how many components they need until immediately before they need them.

65. It is also often necessary given the physical size of commercial vehicle component parts. No commercial vehicle manufacturer has the warehouse space to store the hundreds of thousands to millions of component parts that go into each line of commercial vehicles.

66. The just-in-time delivery model is standard in the commercial vehicle industry, but it also means that BorgWarner does not carry an inventory of excess Parts. This is efficient and necessary, but it also makes any threat to the continued supply of Parts extremely serious.

67. In this case, just-in-time delivery requires that Modern produce and deliver the Parts to BorgWarner on a timely basis so that BorgWarner can produce and deliver the turbocharger assemblies to John Deere and Caterpillar on a timely basis. Otherwise, the entire supply chain falters, potentially stopping production at BorgWarner's and its customers' plants. These reductions and shutdowns would affect suppliers up and down the supply chain, in that employees would be laid off or sent home, delivery and production schedules missed, and vehicles not produced for commercial use.

68. As Modern is aware, it is BorgWarner's sole supplier for the Parts. Further, the Parts are unique in that they are designed and manufactured to meet the particular specifications of BorgWarner and its customers and, consequently, they are not available on the market.

69. Further, based upon information and belief, there is not another manufacturer ready or able to produce replacement Parts without long lead times to prepare manufacturing facilities and acquire raw materials and tools.

70. Moreover, the Parts must meet demanding engineering specifications and, consequently, require prior approval from BorgWarner's OEM customers before they can be incorporated into production commercial vehicles.

71. This approval process is rigorous, expensive, and time-consuming, requiring extensive engineering input from the proposed alternative supplier, BorgWarner, and the OEM customer to design, review, test, and approve the proposed alternative supplier's parts and materials.

72. As a result, BorgWarner cannot replace Modern with another Parts supplier in time to avoid supply chain disruptions.

73. Production at BorgWarner's plant has shut down. This, in turn, caused BorgWarner to miss contractual shipments to its customers shortly thereafter, which has caused its customers' production lines to halt as well.

74. Modern knows that abruptly stopping deliveries of the Parts has and will cause irreparable harm to BorgWarner and its customers. Indeed, BorgWarner advised Modern of this harm on several occasions.

75. Such irreparable harm includes, but is not limited to, BorgWarner and its OEM customers stopping production for components and vehicles related to the Parts. These production stoppages may result in BorgWarner and its customers sending employees home and incurring hundreds of thousands to millions of dollars per hour in reduction or stoppage costs.

76. Other supply chain participants are affected as well. Once BorgWarner's customers' lines are shut down, these customers will be forced to pause their orders to other suppliers, who will then have to halt production and orders from sub-suppliers, and so on and so forth.

77. The greater public is also suffering. Because John Deere's production lines are down, John Deere cannot produce commercial tractors that have been purchased by farmers and are scheduled for delivery. As a result, farmers are not receiving the equipment needed to harvest crops, causing even further ripple effects to the public generally.

78. BorgWarner is also suffering irreparable harm to its goodwill and reputation in the commercial vehicle industry, which BorgWarner has spent years fostering to become a trusted on-time supplier to its customers.

79. Moreover, BorgWarner cannot even avoid this harm by agreeing to Modern's price increase demands under protest such that BorgWarner can recover the overpayments via an award of money damages. Modern ignored BorgWarner's offer to purchase the Critical Needs Parts pursuant to spot buy purchase orders at the price increases sought by Modern. Modern even refused to ship the Parts after BorgWarner issued new purchase orders that withdrew its reservation of rights and committed to the quantity, price, and accelerated payment terms sought by Modern. Thus, while BorgWarner agreed to the exact terms Modern sought, Modern still refused to perform its contractual obligations.

80. Therefore, BorgWarner is left with no recourse but to seek immediate relief from this Court to avoid irreparable harm.

## COUNT I – BREACH OF CONTRACT

81. BorgWarner incorporates by reference in this Count I all preceding allegations in this Verified Complaint.

82. BorgWarner and Modern are parties to a valid and mutually binding requirements contract that requires Modern to supply the Parts to BorgWarner in strict accordance with the quantities, schedules, and conditions set forth in the Supply Contract.

83. The duration of the Supply Contract is the length of the applicable OEM customer's vehicle program (including extensions and model refreshes) into which the Parts are incorporated.

84. BorgWarner has fulfilled all of its contractual obligations under the Supply Contract.

85. At this time, Modern has ceased all supply of the Parts.

86. Modern's failure to timely deliver the ordered quantities of Parts to BorgWarner at the prices set forth in the Supply Contract is a breach of Modern's contractual obligations.

87. Moreover, Modern's refusal to continue supplying the Parts is an anticipatory breach of the Supply Contract.

88. Modern's statement that it "is suspending its performance" under the Supply Contract is an unequivocal declaration of its intent not to perform its obligations under the Supply Contract. Therefore, Modern has anticipatorily breached the Supply Contract.

89. As a result of Modern's breach of the Supply Contract, BorgWarner is unable to meet its contractual obligations to supply its OEM customers with the BorgWarner products into which the Parts are incorporated.

90. BorgWarner has been forced to shut down its production of turbocharger assemblies incorporating the Parts.

91. Similarly, without the finished BorgWarner products incorporating the Parts, BorgWarner's OEM customers' production lines related to the vehicles involved have and will be shut down, resulting in numerous idle production lines and potential layoffs.

92. Moreover, there is not another manufacturer ready or able to produce replacement Parts in time to avoid significant supply chain disruptions.

93. If Modern does not perform its obligations, BorgWarner will have no adequate remedy at law for the harm caused by such breach.

94. As a result of Modern's breach, BorgWarner damages include the resulting cost associated with a shutdown and related legal fees, as well as damage to BorgWarner's business goodwill, relationships with its OEM customers, and its reputation in the commercial vehicle industry as a whole. These will be in an amount greater than $75,000 in addition to enormous irreparable harm for which there is no monetary remedy.

95. Additionally, under the Uniform Commercial Code, BorgWarner is entitled to equitable relief in the form of an order for specific performance because the Parts are specially manufactured goods without readily available substitutes.

## COUNT II – DECLARATORY JUDGMENT

96. BorgWarner incorporates by reference in this Count II all preceding allegations in this Verified Complaint.

97. Modern has contractual obligations to continue to timely supply the Parts to BorgWarner under the Supply Contract at the prices agreed upon in the Supply Contract.

98. BorgWarner has fully complied with all of its obligations under the Supply Contract and has not breached the Supply Contract.

99. Despite this, and despite the parties' years-long supply relationship, Modern refuses to honor its obligations under the Supply Contract to supply the Parts on time, in the quantities required, and on the payment terms required thereunder.

100. The implications of this disagreement between BorgWarner and Modern are significant, as Modern has already ceased shipments of Parts to BorgWarner, the consequence of which has already resulted in a shutdown of BorgWarner's production of turbocharger assemblies as well as a shutdown of at least one of BorgWarner's customers' production line.

101. To avoid this significant public and private harm, and to provide the parties with needed clarity regarding the extent of their contractual obligations, BorgWarner requests a declaratory judgment that the parties are bound by the Supply Contract, which requires Modern to timely supply BorgWarner with the quantities of Parts as ordered by BorgWarner and at the contractual prices.

# RELIEF REQUESTED

WHEREFORE, BorgWarner requests that this Court order the following:

A. A Temporary Restraining Order ordering Modern to immediately expedite delivery of the Critical Needs Parts needed by BorgWarner to restart production lines;

B. A Preliminary Injunction ordering Modern, during the pendency of this litigation, to comply with its contractual obligation to timely supply the Parts to BorgWarner at the prices specified in the parties' contract;

C. An order of specific performance and/or mandatory injunction requiring Modern to continue to supply BorgWarner with the ordered quantities of the Parts under the Supply Contract and at the prices agreed upon in the Supply Contract;

D. A judgment declaring that the parties' are bound by the Supply Contract, which requires Modern to timely supply the Parts as ordered by BorgWarner and at the contractual prices;

E. Monetary damages suffered by BorgWarner due to any ordered Parts not shipped by BorgWarner;

F. All other direct, consequential, and incidental damages suffered by BorgWarner, including, but not limited to, attorney's fees and costs; and

G. All other relief as the Court may deem just, equitable or appropriate under the circumstances.

Dated: November 21, 2023

Respectfully submitted,

By: */s/ Alexandra J. Hirsch*
Alexandra J. Hirsch
N.C. State Bar No. 47808
FOX ROTHSCHILD LLP
101 N. Tryon Street, Suite 1300
Charlotte, North Carolina 28246
Telephone: 704-384-2600

Facsimile: 704-384-2800
Email: ahirsch@foxrothschild.com

Marc C. Tucker
N.C. State Bar No. 25722
FOX ROTHSCHILD LLP
434 Fayetteville Street, Suite 2800
Raleigh, North Carolina 27601-2943
Telephone: 919-755-8713
Facsimile: 919-755-8800
Email: mtucker@foxrothschild.com

*Local Counsel for Plaintiff*


Katherine L. Pullen (P74511)
Ashley E. Racette (P80965)
WARNER NORCROSS + JUDD LLP
2715 Woodward Avenue, Suite 300
Detroit, Michigan 48201
Telephone (313) 546-6000
Email: kpullen@wnj.com
 aracette@wnj.com

*Pro Hac Vice Admission Pending*

## **Verification**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 21, 2023  _____

Steve Maynard
Purchasing Manager
BorgWarner Turbo Systems, LLC