**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**C.A. No. 1:23-cv-00344**

| | |
|---|---|
| BORGWARNER TURBO SYSTEMS, LLC, a Delaware limited liability company, | |
| Plaintiff, | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | |
| MODERN INDUSTRIES, INC., a Pennsylvania corporation, | |
| Defendant. | |

Plaintiff BorgWarner Turbo Systems, LLC ("BorgWarner"), by and through its undersigned counsel, pursuant to Rule 7.1 of the Local Rules of Civil Procedure, respectfully submits this Memorandum of Law in Support of its Motion for Temporary Restraining Order and Preliminary Injunction.

## INTRODUCTION

This case concerns a dispute between commercial vehicle suppliers. BorgWarner, as buyer, and Modern, as seller, are parties to a requirements contract for the supply of commercial vehicle parts (the "Parts"). Modern must supply the Parts ordered by BorgWarner at certain fixed prices and in the quantities ordered by BorgWarner, which is measured by BorgWarner's good faith requirements for the Parts. BorgWarner incorporates the Parts into commercial vehicle assemblies that it supplies on a just-in-time basis to its commercial vehicle Original Equipment Manufacturer ("OEM") customers, including John Deere, Caterpillar, and Navistar. BorgWarner's OEM customers use the commercial vehicle components supplied by BorgWarner to manufacture commercial vehicles.

BorgWarner filed this lawsuit and is seeking injunctive relief because Modern's conduct has shut down part of the commercial vehicle supply chain. Modern has already stopped shipments of the Parts and refuses to provide BorgWarner with adequate assurances that it will: (1) abide by its contractual obligation to expedite past due shipments of the Parts so BorgWarner and its customers can immediately resume production capabilities, and (2) continue supply of the Parts as required by the parties' contract. Modern now states it "is suspending its performance," a direct and unequivocal repudiation of the parties' contract.

Modern's current breaches of the parties' contract and repudiation of all additional contractual obligations to supply the Parts requires immediate injunctive relief due to the irreparable harm it will cause to BorgWarner, BorgWarner's OEM customers, the commercial vehicle industry, and the public if Modern is not enjoined. BorgWarner has run out of the Parts, shutting down BorgWarner's production of assemblies incorporating the Parts. At least one of BorgWarner's customers, John Deere, has shut down production as well. This will stop orders from John Deere to its other suppliers, likely halting production at these other suppliers as well. As production lines continue to stop, employees will be sent home up and down the commercial vehicle supply chain. Moreover, this means John Deere is unable to produce and deliver commercial vehicles that have been purchased and scheduled for delivery to its customers.

Modern's actions thus jeopardize the entire commercial vehicle supply chain unless and until this Court provides injunctive or declaratory relief. Accordingly, the Court should enforce the express terms of the parties' Supply Contract and issue a Temporary Restraining Order and Preliminary Injunction ordering Modern to resume compliance with its existing contractual obligations to timely supply BorgWarner with the Parts as ordered by BorgWarner and at the fixed contractual prices pending resolution of the parties' dispute on the merits.

BorgWarner requests both a Temporary Restraining Order and a Preliminary Injunction. **In order to resolve current shutdowns at BorgWarner and John Deere and avoid imminent additional shutdowns in the commercial vehicle industry, BorgWarner requests a Temporary Restraining Order by Monday, November 27, 2023, ordering Modern to immediately expedite delivery of all finished Parts and expedite manufacture and delivery of all additional Parts needed by BorgWarner to restart production lines.** BorgWarner additionally requests a Preliminary Injunction ordering Modern, during the pendency of this litigation, to comply with its contractual obligation to timely supply the Parts to BorgWarner at the prices specified in the parties' contract. A proposed Temporary Restraining Order is attached as **Exhibit 1**.

## STATEMENT OF FACTS

**A.    Modern supplies BorgWarner with the Parts pursuant to a long-term requirements contract.**

BorgWarner, as buyer, and Modern, as seller, are parties to a long-term requirements contract for the supply of turbine housing (the "Parts"). BorgWarner is a global leader in the field of turbo systems, supplying its commercial vehicle customers with gearboxes, engine clutches, turbochargers, and more. Modern is a machining and manufacturing company. Modern manufactures the Parts and delivers the Parts to BorgWarner's manufacturing facility in Arden, North Carolina.

BorgWarner has contracts with OEM customers and incorporates the Parts into commercial vehicle assemblies for these OEM customers on a just-in-time basis, including for John Deere, Caterpillar, and Navistar. These commercial vehicle assemblies are turbochargers, a key engine component for BorgWarner's OEM customers. BorgWarner is its customers' only source for these

3

products. BorgWarner ships the commercial vehicle components to its OEM customers, who use them to manufacture commercial vehicles.

The parties' requirements contract is evidenced by 12 Purchase Orders and BorgWarner's Purchase Order Terms and Conditions incorporated into those Purchase Orders (collectively, the "Supply Contract"). (*See* Ver. Compl, Exs. 1, 2.) The Supply Contract has a term that lasts for the duration of the various OEMs' program production life, and Modern is expressly bound to continue supplying BorgWarner's requirements as ordered, and expressly prohibited from terminating the Supply Contract, for the duration of that term. (*See* Ver. Compl., Ex. 2, §§ 1, 10.)

The Supply Contract requires timely delivery of all Parts ordered by BorgWarner as indicated on BorgWarner's delivery schedules:

> Deliveries must be made both in quantities and at times specified on the face of this Purchase Order or in Buyer's schedules and time is of the essence. Buyer's delivery schedules are an integral part of the Purchase Order, are governed by these terms and conditions and are not independent contracts. [*Id.*, § 4.]

This requires Modern to deliver all the Parts ordered by BorgWarner on time and in the quantities ordered. (*Id.*) This is in large part due to the "just-in-time" nature of the supply chain, which is standard in the commercial vehicle industry for several reasons. (*See* Ver. Compl., ¶ 66.) The just-in-time model means that manufacturers up and down the supply chain do not hold any significant inventory of parts; instead, they order only the amount of parts they need for immediate production. (*Id.*, ¶ 64.) This model allows manufacturing facilities up and down the supply chain to operate together and gives the supply chain flexibility to adjust production quantities based on consumer demand. (*Id.*) It is also often necessary given the physical size of commercial vehicle component parts. (*Id.*, ¶ 65.) No commercial vehicle manufacturer has the warehouse space to store the hundreds of thousands to millions of component parts that go into each line of commercial vehicles. (*Id.*) Instead, suppliers deliver materials and parts as they are needed. (*Id.*, ¶ 64)

4

Thus, under the just-in-time model, neither BorgWarner nor its OEM customers have a sufficient inventory of excess Parts or the turbochargers produced by BorgWarner with the Parts. (*Id.*, ¶ 66.) Consequently, timely delivery is critical. (*Id.*, ¶ 67.) Failure to deliver Parts on time can shut down the entire supply chain, first stopping the Parts-related production at a supplier like BorgWarner, and then stopping production at BorgWarner's OEM customers' plants related to the products into which BorgWarner's parts are incorporated. (*Id.*) These stoppages impact suppliers up and down the supply chain; when suppliers near the top of the supply chain halt production, suppliers further down must as well. (*Id.*) Therefore, the just-in-time model requires that Modern deliver the Parts to BorgWarner on a timely basis pursuant to the Supply Contract. (*Id.*) Thus, the Supply Contract provides for exactly this, obligating Modern to deliver all Parts ordered by BorgWarner on time and in the quantities ordered. (Ver. Compl., Ex. 2, § 4.)

The Supply Contract also provides for firm prices. (*Id.*, § 2.) The Supply Contract also expressly contemplates changes in Modern's costs, for any reason, associated with Modern's performance under the Supply Contract, and the parties agreed to contractually allocate that risk to Modern:

> This Purchase Order must not be filled at prices higher than those specified on the Purchase Order, unless otherwise agreed to in writing by [BorgWarner]. . . [BorgWarner] will have no responsibility for any increased costs incurred by [Modern] in connection with any raw materials or subcontractors, unless such additional costs have been negotiated and agreed to in advance and in writing by [BorgWarner]. [*Id.*]

Modern therefore cannot unilaterally impose price increases during the pendency of the Supply Contract.

### B. Modern breaches the Supply Contract.

Modern is under a contractual obligation to supply the Parts ordered by BorgWarner on the date the Parts are required to be delivered to BorgWarner's facility and in the quantities ordered

by BorgWarner. Modern is in breach of the Supply Contract if it fails to timely deliver the Parts in the quantity specified by BorgWarner.

For many years, Modern generally performed in accordance with the Supply Contract by timely supplying BorgWarner's requirements for the Parts. (Ver. Compl., ¶ 21.) However, in late 2022, contrary to the terms of the Supply Contract, Modern began demanding price increases from BorgWarner. (*Id.*, ¶ 22.) Modern also demanded that BorgWarner implement minimum order quantities in connection with the Supply Contract. (*Id.*) BorgWarner did not agree to these demands. (*Id.*, ¶ 23.)

While BorgWarner was under no contractual obligation to provide any extra-contractual price increases to Modern, BorgWarner attempted to work with Modern in good faith to reach a compromise on some price adjustments in an effort to ensure that the supply chains remain running. (*Id.*, ¶ 24.) Modern did not negotiate in good faith with BorgWarner and instead reiterated its demands for price increases and minimum order quantities. (*Id.*, ¶ 25.) BorgWarner refused to accede to Modern's demands. (*Id.*, ¶ 26.)

During this time, BorgWarner continued to issue releases to Modern for BorgWarner's requirements of the Parts. (*Id.*, ¶ 27.) However, in direct contravention of its contractual obligations, Modern stopped all shipments of the Parts. (*Id.*, ¶ 28.) On October 20, 2023, BorgWarner contacted Modern regarding its critical need for specified quantities of certain Parts (the "Critical Needs Parts") to ensure the supply chains remain running. (*Id.*, ¶ 31.) Modern responded but did not agree to resume shipment of the Parts, even the Critical Needs Parts. (*Id.*, ¶ 32.) While Modern stated it would be "available to discuss further," it ceased all further substantive communication with BorgWarner. (*Id.*)

6

Because Modern failed to deliver the Parts to BorgWarner as required under the Supply Contract, BorgWarner's Arden, North Carolina plant ran out of its Parts inventory to supply its OEM customers. (*Id.*, ¶ 33.) Consequently, on October 31, 2023, BorgWarner's counsel sent a letter to Modern requesting written adequate assurances under UCC § 2-609 that Modern would abide by its contractual obligations and resume timely supplying the Parts at the fixed contract prices as required pursuant to the releases issued under the Supply Contract. (*Id.*, ¶ 35.) BorgWarner also reminded Modern of its obligation to ship the Critical Needs Parts on an expedited basis (at Modern's expense) given that Modern failed to meet its delivery requirements. (*Id.*, ¶ 37.) BorgWarner thus communicated its expectation that Modern deliver the Critical Needs Parts immediately and on an expedited basis to ensure the supply chains remain running. (*Id.*)

On November 1, 2023, Modern acknowledged receipt of the correspondence but provided no substantive response. (*Id.*, ¶ 39.) BorgWarner's counsel responded and advised Modern that Modern's email did not respond to BorgWarner's demand for adequate assurance of due performance or provide a timeline for such a response. (*Id.*, ¶ 40.) BorgWarner's counsel also reiterated the critical importance of receiving expedited delivery of the Critical Needs Parts so that the supply chain could restart operation. (*Id.*) Modern did not respond. (*Id.*, ¶ 41.)

Despite receiving no response, BorgWarner continued its efforts to restart the supply chain. (*Id.*, ¶ 42.) On November 7, 2023, BorgWarner issued "spot buy" purchase orders to Modern at the new pricing demanded by Modern for the Critical Needs Parts. (*Id.*, ¶ 43.) BorgWarner issued these "spot buy" purchase orders under protest and with a full reservation of BorgWarner's rights as a temporary measure to ensure the supply chain can continue running while the parties discuss a commercial resolution. (*Id.*, ¶ 44.) BorgWarner gave Modern a deadline of November 8, 2023 at 12:00 p.m. to respond. (*Id.*, ¶ 45.) Modern did not respond. (*Id.*, ¶ 46.)

That evening, BorgWarner advised Modern that, because Modern had ignored all attempts by BorgWarner to reach a commercial resolution, BorgWarner had no choice but to pursue legal action. (*Id.*, ¶ 47.) Modern responded the next afternoon, but once again failed to provide any substantive response. (*Id.*, ¶ 48.) Significantly, Modern failed to commit to expedited shipment of the Critical Needs Parts or otherwise commit to continue shipments of any of the Parts despite its contractual obligations. (*Id.*, ¶ 49.) The next day, BorgWarner responded again, reiterating the emergency situation Modern had created and the critical importance of receiving the Critical Needs Parts. (*Id.*, ¶ 50.)

On Monday, November 13, 2023, BorgWarner's counsel finally received correspondence from legal counsel for Modern. (*Id.*, ¶ 51.) However, rather than attempt to work cooperatively with BorgWarner, Modern expressly and unequivocally repudiated its contractual obligations. (*Id.*, ¶ 52.) Modern rejected BorgWarner's "spot buy" purchase orders, which offered to purchase the Critical Needs Parts at the exact price increase demanded by Modern. (*Id.*, ¶ 53.) Modern also stated that it "is suspending its performance" under the Supply Contract, refusing to manufacture and deliver the Parts. Modern also disclosed that it had stopped purchasing components for the Parts, therefore could not manufacture certain Parts, and anticipated it would take weeks to purchase and receive these components to even restart manufacture of the Parts. (*Id.*, ¶ 54.) Modern did not make a counteroffer to the "spot buy" purchase orders, offering no avenue by which BorgWarner could temporarily resolve the parties' dispute to receive Parts and resume operation of the supply chain. (*Id.*, ¶ 55.)

Nonetheless, in a final attempt to restart the supply chain, BorgWarner sent new "spot buy" purchase orders on November 20, 2023 at the exact price increase demanded by Modern, in the exact quantities demanded by Modern, on accelerated payment terms, and withdrawing its

8

reservation of rights with regard to the quantities purchased (the "Spot Buy Offer"). (*Id.*, ¶ 56.) BorgWarner gave Modern a deadline of November 21, 2023 at 3:00 p.m. to accept or reject the Spot Buy Offer. (*Id.*, ¶ 57.) Modern rejected the Spot Buy Offer, and instead attempted to extract a litany of concessions from BorgWarner as to entirely separate programs. (*Id.*, ¶ 58.)

### C. Modern's breach necessitates injunctive relief.

Modern is BorgWarner's sole supplier for the Parts. (*Id.*, ¶ 68.) The Parts meet the specifications of BorgWarner's OEM customers and are the only Parts that have received approval from BorgWarner's OEM customers. (*Id.*) Therefore, the Parts are unique, not readily available on the market, and obtaining the requisite approval from BorgWarner's OEM customers for an alternate supplier of the Parts would be an enormous and time-consuming undertaking. (*Id.*, ¶¶ 68-71.) As a result, BorgWarner cannot replace Modern with another Parts supplier in time to avoid supply chain disruptions. (*Id.*, ¶ 72.)

Modern supplies 12 types of Parts to BorgWarner. (*Id.*, ¶ 29.) Modern has already missed shipments for 11 types of Parts. (*Id.*, ¶ 30.) Modern has run out of its supply of 7 types of Parts, which constitute the Critical Needs Parts. (*Id.*, ¶ 34.) As a result, BorgWarner's production lines that require the Critical Needs Parts have shut down, and the relevant lines at BorgWarner's OEM customers have begun to shut down. (*Id.*, ¶ 73.)

Such shutdowns will result in irreparable harm up and down the supply chain, including BorgWarner and BorgWarner's OEM customers stopping production for assemblies, components, and commercial vehicles incorporating the Parts. (*Id.*, ¶ 75.) This could result in BorgWarner and BorgWarner's OEM customers incurring millions of dollars in damages. (*Id.*) Furthermore, BorgWarner and BorgWarner's OEM customers could be forced to send workers home, reduce hours, or institute lay-offs at impacted facilities. (*Id.*, ¶ 62.) BorgWarner would also suffer

irreparable harm to its goodwill and reputation with its OEM customers, as well as in the commercial vehicle industry in general, which it has spent years fostering. (*Id.*, ¶ 78.)

BorgWarner has done everything it can to try to avoid this outcome and to try to get Modern to agree to continue to supply the Parts to BorgWarner. However, Modern's conduct leaves BorgWarner with no option but to seek recourse in this Court.

## ARGUMENT

**I.** **BorgWarner is entitled to both a Temporary Restraining Order and Preliminary Injunction.**

BorgWarner seeks both a temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65. A temporary restraining order and preliminary injunction are provisional remedies designed "to preserve the relative positions of the parties" and "protect the status quo." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit to preserve the court's ability to render a meaningful judgment on the merits.") The Fourth Circuit defines the "status quo" as the "last uncontested status between the parties which preceded the controversy." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Sometimes, to preserve the status quo, the court must first restore the status quo. "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *Id.*

"The standard for granting either a TRO or a preliminary injunction is the same and is well established." *Paradies Shops, LLC v. Brookstone Charlotte, LLC*, No. 3:19-cv-00631-KDB-DCK, 2019 WL 6337818 (W.D.N.C. Nov. 26, 2019). Both are warranted if BorgWarner demonstrates:

1. A likelihood of success on the merits.

2.      Irreparable harm in the absence of preliminary relief.

3.      The balance of equities favors preliminary relief.

4.      Injunctive relief is in the public interest.

*Id.*; *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). All four requirements are satisfied here, and injunctive relief is warranted.

**A.      BorgWarner is likely to prevail on the merits of its claims for breach of contract and declaratory judgment because Modern is contractually obligated to supply the Parts.**

To demonstrate a likelihood of success on the merits, a plaintiff must show that it is likely to succeed on the merits; however, a plaintiff "need not show a certainty of success." *League of Women Voters*, 769 F.3d at 247. BorgWarner will succeed on its claims for breach of contract and declaratory judgment due to Modern's failure and refusal to timely supply the Parts. To prevail on a breach of contract claim under Michigan law[1], a plaintiff must establish the following: "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 100; 878 N.W.2d 816 (2016). BorgWarner is likely to prevail on all three elements.

**1.      The parties entered into a valid and binding requirements contract for the Parts.**

Here, the Supply Contract constitutes a valid, binding, and enforceable requirements contract under Michigan law. Requirements contracts are valid under the Michigan Uniform Commercial Code ("UCC").[2] MCL § 440.2306. A requirements contract is one in which the

---

[1] The Supply Contract is governed by Michigan law. "This Purchase Order is to be construed according to the law of the State of Michigan, without regard to its conflicts of law principles." (Ex. 2, § 27.)
[2] The Michigan UCC applies to contracts for the sale of goods. MCL § 440.2102. The instant dispute arises out of the sale of commercial vehicle parts, which are goods under the UCC. Accordingly, the Michigan UCC applies to this dispute.

11

quantity of goods to be provided by the seller to the buyer is measured by the buyer's good faith requirements for such goods. *Id.*

BorgWarner issued the Supply Contract to Modern, and Modern accepted the Supply Contract through performance by manufacturing and shipping the Parts according to releases issued under each of the Purchase Orders. (*See* Ver. Compl., Ex. 2, § 1 ("[C]ommencement of performance of any work or services pursuant to this Purchase Order, will constitute acceptance of this Purchase Order.").) This accords with the Michigan UCC, which permits acceptance by performance:

> A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. [MCL § 440.2204(1).]
>
> (1) Unless otherwise unambiguously indicated by the language or circumstances . . . (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods. . . . [MCL § 440.2206.]

*See also Sundram Fasteners Ltd. v. Flexitech, Inc.*, No. 08-CV-13103, 2009 WL 3763772, at *8 (E.D. Mich. Nov. 9, 2009) (describing that "[i]n the automotive industry and under Michigan law" a purchase order becomes binding on the seller once "shipment orders are issued against them"). Moreover, Modern never rejected or otherwise objected to any of the Purchase Orders prior to accepting each Purchase Order by performing under it.

As a requirements contract permitted by MCL § 440.2306, the Supply Contract requires Modern to supply BorgWarner with BorgWarner's quantity requirements for the Parts. (Ver. Compl., Ex. 2, § 1.) Modern is required to timely supply all Parts as ordered by BorgWarner at the prices set forth on each Purchase Order. (*Id*. at §§ 1, 2.)

### 2. Modern breached the Supply Contract by failing to deliver the Parts ordered by BorgWarner.

Modern is under a contractual obligation to deliver the Parts ordered by BorgWarner on the date the Parts are required to be delivered and at the contractually agreed-to-price. (*Id.*) Modern breached the Supply Contract by failing to timely deliver the Parts ordered by BorgWarner on the dates the Parts were required to be delivered and at the contractually agreed-to price. Modern supplies 12 types of Parts to BorgWarner. (*Id.*, ¶ 29.) Modern has entirely stopped shipping ordered Parts and missed scheduled deliveries for 11 types of Parts. (*Id.*, ¶ 30.) This is a clear breach of the Supply Contract.

Moreover, Modern's refusal to continue supplying the Parts is an anticipatory breach of the Supply Agreements. An anticipatory breach of contract is a repudiation of a contractual duty before the time fixed in the contract for performance has arrived. *Stoddard v. Manufacturers Nat. Bank of Grand Rapids*, 234 Mich. App. 140, 163; 593 N.W.2d 630 (1999). "Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to . . . sue immediately for the breach of contract. *Id.* Modern has anticipatorily breached the Supply Contract by stating it "is suspending its performance" under the Supply Contract. Modern's statement that it "is suspending its performance" under the Supply Contract is an unequivocal declaration of its intent not to perform its obligations under the Supply Contract. (*See* Ver. Compl., Ex. 12.)

Therefore, BorgWarner is likely to prevail on its breach of contract claim.

### 3. Here, injunctive relief is particularly appropriate in light of BorgWarner's entitlement to specific performance under the UCC.

Granting BorgWarner's request for injunctive relief would simply constitute an award of specific performance to which BorgWarner is entitled under the UCC. Indeed, under UCC § 2-711, when a seller fails to make delivery, the buyer may "in a proper case obtain specific

13

performance." MCL § 440.2711(2)(b). Specific performance under the UCC is particularly appropriate where the goods contracted for are unique or in short supply from a limited number of potential sources. MCL § 440.2716(1) ("Specific performance may be decreed where the goods are unique . . . ."); *Jaup v. Olmstead*, 334 Mich. 614, 617; 55 N.W.2d 119 (1952) ("[I]f the specific property is not obtainable on the market and damages will not provide adequate compensation, equity may take jurisdiction."); *TRW, Inc. v. Indus. Sys. Assoc. Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002) (affirming preliminary injunction ordering defendant supplier to continue to supply goods where defendant was "sole supplier" of parts to the plaintiff).

As the official comments to this Section of the UCC explain, contracts "involving a particular or peculiarly available source or market" represent "the typical commercial specific performance situation." MCL § 440.2716, Cmt. 2. A plaintiff buyer's "inability to cover" the goods from another source is also "strong evidence" that specific performance is appropriate. *Id.*; *see also Hemlock Semiconductor Corp. v. Kyocera Corp.*, 747 F. App'x 285, 295 (6th Cir. 2018) (Clay, J., dissenting) (applying Michigan law and citing comment 2 to MCL § 440.2716 for this rule).

Here, the Parts are unique turbine housing manufactured only by Modern for BorgWarner's use in the turbocharger assemblies BorgWarner supplies to various OEM customers. (Ver. Compl., ¶ 68.) The Parts are not fungible goods that can be procured from any alternative source; instead, Modern is the sole supplier of the Parts. (*Id.*) Moreover, the Parts must meet demanding engineering specifications and, consequently, require prior approval from BorgWarner's OEM customers before they can be incorporated into production commercial vehicles. (*Id.*, ¶ 70.) This approval process is rigorous, expensive, and time-consuming, requiring extensive engineering input from the proposed alternative supplier, BorgWarner, and the OEM customer to design,

14

review, test, and approve the proposed alternative supplier's parts and materials. (*Id.*, ¶ 71.) Modern has ceased shipment of these unique Parts, which has stopped production at BorgWarner as well as production at BorgWarner's OEM customers' plants, even though Modern is aware that BorgWarner cannot replace Modern in time to avoid supply chain disruptions. (*Id.*, ¶ 73.)

Because of these circumstances, Modern is obligated to continue supplying BorgWarner in a timely manner to avoid this harm. Indeed, recognizing the nature of the commercial vehicle industry and the need for just-in-time deliveries, the parties expressly agreed that if either party terminates the Supply Contract, Modern *must* still continue to supply BorgWarner for an appropriate transition period to avoid any interruption in the supply chain, regardless of which party terminates and for what reason. (Ver. Compl., Ex. 2, § 12.)

Thus, due to the unique nature of the Parts, and Modern's agreement to ensure that there is no interruption in the supply of Parts, BorgWarner is likely to succeed on the merits of its claim for specific performance.

## B. BorgWarner will suffer irreparable injury if Modern is not required to perform its contractual obligation to continue supplying the Parts.

BorgWarner will be irreparably harmed in the absence of a Temporary Restraining Order and Preliminary Injunction. An injury is irreparable if there is no adequate remedy at law. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (explaining that a preliminary injunction will not issue when the harm suffered can be remedied by money damages). Accordingly, a plaintiff must demonstrate that adequate compensatory or other corrective relief at the time of judgment will not be an adequate remedy. *Id.* The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. *See e.g., Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 196-97 (4th Cir. 1977) (abrogated as to the balance-of-hardship test) (concluding the trial court's finding of no

15

irreparable harm was clearly erroneous where the defendant manufacturer had terminated the plaintiff's furniture line dealership because the harm posed to the plaintiff's goodwill was incalculable inasmuch as the plaintiff would be unable to fill customer orders and then gain a reputation for unreliability).

There are unique aspects of the automotive supply chain, which apply equally to the commercial vehicle supply chain, that make irreparable harm inevitable in the event of a shutdown due to a supplier's refusal to deliver parts. Under the just-in-time system, which is standard in the automotive and commercial vehicle industries, only minimal inventories are maintained, and deliveries must be made continuously to keep assembly lines operating. (Ver. Compl., ¶ 66.) The failure of a single supplier in a just-in-time supply chain to fulfill its contractual commitments will thus inevitably cause a ripple effect throughout the chain, preventing all suppliers of that assembly from providing parts to the vehicle manufacturer.[3] (*Id.* at ¶¶ 75-76.) The consequences, as many courts have recognized, can be catastrophic:

> Because, for the sake of efficiency, car manufacturers typically do not keep large reserve banks of parts, component parts are often incorporated into a finished product within a few hours of their delivery. As a result, a supplier's failure to make scheduled shipments may have immediate and dramatic consequences, in that any interruption in a manufacturer's production schedules might result in a shut down of certain assembly lines while it obtained new suppliers and made the necessary arrangements for new production tooling and dies. **These shut downs, in turn, might cause the layoff of innumerable employees and a damage claim against the supplier along the order of millions of dollars a day** . . . [T]he potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court.

---

[3] This is why the Supply Contract expressly states that "time is of the essence." (Ver. Compl., Ex. 2, § 4.)

*Eberspaecher North America, Inc. v. Nelson Global Prods., Inc.*, No. 12-11045, 2012 WL 4356781, *5-6 (E.D. Mich. Sept. 23, 2012) (internal citations and quotations removed, emphasis added).

For this reason, courts that have frequently faced potential manufacturing shutdowns in the automotive industry have repeatedly granted preliminary injunctive relief to require part suppliers to continue delivery of parts to prevent the irreparable harm that inevitably occurs in the automotive supply chain if there is a refusal to ship:

- *See, e.g., Cooper-Standard Automotive Inc. v. Daikin Am., Inc.*, No. 21-cv-12437, 2021 WL 4975067, at *5 (E.D. Mich. Oct. 26, 2021) (granting an injunction requiring automotive supplier to continue shipping, and acknowledging that the "'just-in-time' nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under contract.");

- *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 538 F. Supp. 3d 620, 630 (S.D. W. Va. 2021) (granting an injunction because "there is a likelihood of irreparable harm to reputational standing of [plaintiff] in the automotive industry if [defendant] fails to supply the parts in the Contract");

- *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012) ("[T]he potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court.");

- *Almetals Inc. v. Wickeder Westfalenstah L, GmbH*, No. 08-10109, 2008 WL 4791377, at *9 (E.D. Mich. Oct. 29, 2008) (granting injunction in automotive supply chain dispute where plaintiff refused to ship unless the buyer agreed to altered payment terms when there was no alternative source of supply for the components and the buyer would lose goodwill and business relationships with customers without an injunction);

- *Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*, No. 08-CV-10558, 2008 WL 4279358, at *1 (E.D. Mich. Sept. 16, 2008) ("If a supplier of [a tier 1] threatens to cut off shipments if a price increase is not granted, [the tier 1] is in the position of being forced to shut down its assembly operations which in turn, could force an OEM to shut down as well due to the unavailability of substitute goods.");

- *TRW, Inc. v. Indus. Sys. Assocs., Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002) (holding that the district court did not abuse its discretion by entering a preliminary injunction where automotive supplier could not readily obtain parts from a second source, which would irreparably harm the supplier's goodwill and business reputation)*; and*

17

- *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 798 n.7 (E.D. Mich. 1990) ("It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks of parts . . . . A supplier's failure to make scheduled shipments may have immediate and dramatic consequences.").

That is the case here, where if Modern does not resume compliance with its contractual obligations to supply the Parts to BorgWarner at the contractually agreed price, the resulting harm will be irreparable. BorgWarner has already run out of the Critical Needs Parts, stopping production at BorgWarner as well as at least one of BorgWarner's OEM customers' plants. Unless Modern immediately resumes shipping Parts, BorgWarner's product lines will remain shut down at its Arden plant as well as BorgWarner's customer's plant. The resulting financial impact on BorgWarner and its customers will be catastrophic, rapidly racking up hundreds of thousands to millions of dollars in shutdown damages, in addition to incalculable losses from being shut out of future supply work with its OEM customers.

Further, BorgWarner's reputation as a reliable and on-time supplier will be severely damaged and it will likely lose future business opportunities with other potential customers. BorgWarner has spent years fostering its goodwill and supplier credentials to become a trusted supplier to its customers. This break in BorgWarner's supply could severely damage the substantial goodwill and business reputation that BorgWarner has acquired, causing it incalculable and irreparable injury. *See Almetals Inc. v. Wickeder Westfalenstah L. GmbH.*, No. 08-10109, 2008 WL 4791377, at *9 (E.D. Mich. Oct 29, 2008) (granting injunction against automotive supplier to keep shipping where there was no alternative source of supply for the components and plaintiff would lose goodwill and business relationships with customers); *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 538 F. Supp. 3d 620, 623-25, 630-32 (S.D.W. Va. 2021) (same).

18

Moreover, BorgWarner cannot even avoid this harm by agreeing to Modern's price increase demands under protest or with a reservation of rights such that BorgWarner can recover the overpayments via an award of money damages. Indeed, BorgWarner tried this, but Modern rejected BorgWarner's proposal. Modern even refused to ship the Parts after BorgWarner issued new purchase orders that withdrew its reservation of rights and committed to the quantity, price, and accelerated payment terms sought by Modern. Thus, while BorgWarner agreed to the terms Modern sought, Modern still refused to perform its contractual obligations.

The certainty that BorgWarner will suffer immediate and irreparable harm supports entry of injunctive relief. Without prompt issuance of a Temporary Restraining Order and Preliminary Injunction, it will be too late to rectify the line shutdowns and resulting harms to BorgWarner's goodwill, business relationships, reputation, and financial status.

### C.     The balance of harms favors granting injunctive relief.

In contrast to the potential irreparable harm to BorgWarner, ordering Modern to continue to timely supply the Parts to BorgWarner at the fixed prices identified in the Supply Contract will merely maintain the *status quo* and require Modern to do nothing more than what it is obligated to do and has been doing under the Supply Contract for years. Thus, when this is weighed against the inevitable irreparable harm to BorgWarner if the Court does not grant an injunction, the balance of harms tips decisively in favor of granting BorgWarner's motion. *See Sogefi USA*, 538 F. Supp. 3d at 630 (holding balance of equities favors automotive component part purchaser, as opposed to supplier, when injunctive relief requiring the supplier to abide by the parties' agreement merely maintained the status quo); *League of Women Voters*, 769 F.3d at 236 (preserving *status quo* so that final hearing can be held without injury to either party is another valid consideration in issuing an injunction).

Furthermore, if Modern does not recommence performance and continue to timely supply the Parts to BorgWarner, BorgWarner's OEM customers will not be able to receive the products they need and will be forced to shut down. As stated, at least one OEM Customer, John Deere, has already been impacted. Harm to non-parties like this—which can have additional down-the-supply-chain effects—also weighs in favor of injunctive relief. *See Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*, No. 08-CV-10558, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008) (holding that potential shutdown of third party OEMs based on lack of parts weighs in favor of granting injunctive relief). Therefore, this factor also favors injunctive relief.

### D. The public interest is served by granting injunctive relief.

There will be no harm to the public interest if this Court grants BorgWarner's motion and simply requires Modern to continue abiding by the same contractual obligations it has operated under for years. But there will be harm to the public interest if the requested injunctive relief is not granted. The public has an interest in seeing valid contracts enforced. *See UBS Painwebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002) ("The public has an interest in ensuring that contracts are enforced.").

The public also has an interest in avoiding supply chain shutdowns. *See, e.g., Sogefi USA*, 538 F. Supp. 3d at 630 ("Keeping a supply chain open keeps people working, keeps trade crossing the borders, keeps companies producing important products, and keeps important products in the marketplace. Automobiles are essential to modern day life, and disruption of the supply chain would not only hurt [buyer], but the public as well."); *Key Safety Sys.*, 2008 WL 4279358 at *13 (holding that the public interest factor weighed in favor of injunctive relief where compelling seller to supply automotive part would avoid consequential plant shutdowns or lay-offs and would avoid economic harm to the state, region, and nation); *Almetals*, 2008 WL 4791377 at *10 ("[D]enying

the injunction places at risk the operations of Almetals, and, correspondingly numerous customer assembly plants," which "would be disastrous, irreparably damaging Almetals' business and reputation, and causing further detriment to the economy.").

Modern's failure to timely deliver the Parts to BorgWarner has already caused BorgWarner and at least one of its OEM Customers—and potentially other supply chain participants[4]—to shut down production, potentially causing lay-offs and economic harm throughout this commercial vehicle supply chain. The public interest thus weighs heavily in favor of the efficient administration of the commercial vehicle industry, and against these potential shutdowns. As a final matter, the greater public is also suffering. Because John Deere's production lines are down, John Deere cannot produce commercial tractors that have been purchased by farmers and are scheduled for delivery. As a result, farmers are not receiving the equipment needed to harvest crops, causing even further ripple effects to the public generally. This harm to the public will only multiple as additional BorgWarner customers' shut down production.

## II.    Bond is not necessary.

The purpose of Rule 65's bond requirement is to "provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n. 3 (4th Cir. 1999). There is no such potential harm here because BorgWarner will continue to pay Modern for all Parts delivered. Where this is the case, it can be appropriate to set a bond of $0 or another nominal

---

[4] If an OEM Customer shuts down production, this impacts numerous suppliers and sub-suppliers down the supply chain. When suppliers near the top of the supply chain halt production, suppliers further down must as well. Thus, if BorgWarner does not receive the Parts, it cannot produce turbochargers. Without turbochargers, John Deere cannot produce engines. John Deere will therefore halt orders to suppliers who provide other components for John Deere engines. These suppliers will then halt orders to their sub-suppliers. And so on.

21

amount. *See id.* at n. 3 ("In some circumstances, a nominal bond may suffice."). *See also Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 538 F.Supp.3d 620, 631 (S.D. W.Va. May 7, 2021) (a buyer of actuator covers used in products it sold to an automobile manufacturer was required to post nominal bond of $100 in connection with the grant of buyer's request for preliminary injunction enjoining the seller from violating its contractual obligations, where the risk of harm to the seller was low, as the buyer was required to pay the seller for all parts shipped); *ProPac, Inc. v. $5,219,224.20 U.S. Dollars Deposited to Acct. of Med. Biowaste Sols., Inc.*, No. CV 2:20-3792-RMG, 2020 WL 6707608, at *3 (D.S.C. Nov. 16, 2020) (setting a bond of $0 because there was "no risk of [the defendant] sustaining 'costs or damages' associated with preserving the status quo"); *Potomac Conf. Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, No. DKC 13-1128, 2014 WL 857947, at *22 (D. Md. Mar. 4, 2014) (setting a bond of $2,000 because "in circumstances where the risk of harm is remote, a nominal bond may suffice").

Accordingly, bond is not necessary. If any bond is required, a nominal bond will suffice.

## CONCLUSION

Modern's breach of the Supply Contract has no legitimate basis and will cause irreparable harm to BorgWarner, its customers, the commercial vehicle industry, and the general public. For these reasons, BorgWarner requests both a Temporary Restraining Order and a Preliminary Injunction. In order to resolve current shutdowns at BorgWarner and John Deere and avoid imminent additional shutdowns in the commercial vehicle industry, BorgWarner requests a Temporary Restraining Order ordering Modern to immediately expedite delivery of all finished Critical Needs Parts and expedite manufacture and delivery of all additional Critical Needs Parts required by BorgWarner to restart production lines. BorgWarner additionally requests a Preliminary Injunction ordering Modern, during the pendency of this litigation, to comply with its

contractual obligation to timely supply the Parts to BorgWarner at the prices and in the quantities specified in the parties' contract. A proposed order is attached as **Exhibit 1**.

Dated: November 21, 2023

Respectfully submitted,

By: */s/ Alexandra J. Hirsch*
    Alexandra J. Hirsch
    N.C. State Bar No. 47808
    FOX ROTHSCHILD LLP
    101 N. Tryon Street, Suite 1300
    Charlotte, North Carolina 28246
    Telephone: 704-384-2600
    Facsimile: 704-384-2800
    Email: ahirsch@foxrothschild.com

    Marc C. Tucker
    N.C. State Bar No. 25722
    FOX ROTHSCHILD LLP
    434 Fayetteville Street, Suite 2800
    Raleigh, North Carolina 27601-2943
    Telephone: 919-755-8713
    Facsimile: 919-755-8800
    Email: mtucker@foxrothschild.com

    *Local Counsel for Plaintiff*

    Katherine L. Pullen (P74511)
    Ashley E. Racette (P80965)
    WARNER NORCROSS + JUDD LLP
    2715 Woodward Avenue, Suite 300
    Detroit, Michigan 48201
    Telephone (313) 546-6000
    Email: kpullen@wnj.com
          aracette@wnj.com

    *Pro Hac Vice Admission Pending*

23